## J. B. Swetman v. C. B. Sanders.

### No. 7414.

Pre-emption—Residence Necessary.—November 16, 1874, Johnson had the land in controversy, 160 acres, surveyed for his pre-emption. He never lived upon the land, before or after the survey. In 1875 he made a verbal sale of the land to one Cates, who went into possession soon after. In 1882 Johnson, with consent of Cates, executed a deed for the land to Sanders, who had bought Cates' claim. On April 9, 1884, Sanders made proof of his occupancy, and resided upon the land until 1886, when he moved to the Indian Nation, leaving the land in possession of Swetman. Neither Cates nor Sanders ever had the land surveyed. Swetman, being head of a family, repudiated Sanders' claim, and pre-empted the land. His application was made May 10, 1888. Sanders sued for the land, also claimed value of improvements appropriated by Swetman. *Held:*

1. The survey of the land in 1874 under the Act of 1873 was void, from the fact that Johnson, for whom it was made, never occupied or settled upon the land.

2. Not being an actual settler upon the land, Johnson's claim did not come under the Act of March 13, 1875, for relief of actual occupants, etc.

3. The land being public domain, Swetman could repudiate his contract with Sanders and secure the land under the law.

4. Sanders, even if entitled to pay for improvements made by him, could not have the land charged with their value, on account of its homestead character.

Appeal from Jack. Tried below before Hon. J. W. Patterson.

*Nicholson & Nicholson,* for appellant.—1. A survey by one man and settlement by another many months after will not pre-empt land, but it must be occupied by him at whose instance the survey is made. De Montel v. Speed, 53 Texas, 339; Sellman v. Lee, 55 Texas, 332.

2. The defendant having taken no title from either Cates or Johnson, and the land being of the public domain, he was not bound by any contract he might have made with them that would prevent his filing on the land, he being otherwise competent to settle a homestead. Horne v. Gambrell, 1 W. & W. C. C., sec. 1000; Wheeler v. Styles, 28 Texas, 240.

*Thos. D. Sporer,* for appellee.—1. If Asbury Johnson had said land surveyed, and was the head of a family, and intended to make this the home of his family, but before he went upon the land he was compelled temporarily to leave the country, but with the intention of returning again to carry out his intention of improving and making this place the home of his family, he would have an inchoate right in the land, which would entitle him to return to the land, or to sell or transfer the same to another person, provided no abandonment was proved and the rights of no third party intervened between his departure and the sale of the land; and it would not be necessary for Johnson's assignee to have the land re-

surveyed, but the survey made by Johnson would enure to the assignee who purchased his inchoate right to the land. Jennings v. De Cordova, 20 Texas, 514; Thornton v. Murray, 50 Texas, 166; Bledsoe v. Cains, 10 Texas, 456.

2. If Cates, as assignee of Johnson, went into possession of said premises, and occupied and improved the same before the abandonment by Johnson was established, the survey made by Johnson would enure to the benefit of Cates and his assignees, and it would not be necessary to have said land resurveyed; and if said Cates and said Johnson sold the same to appellee before the abandonment of said Johnson was established, and before the rights of third parties had intervened, and said appellee as such assignee went into possession of said place, occupied, improved, and lived on the same for a period of three consecutive years, and established his three years occupancy, as required by law, then the proof of abandonment by Asbury Johnson after this came too late. The land was not then public domain, and was not subject to file and location under the homestead pre-emption laws, as attempted by defendant Swetman. Thornton v. Murray, 50 Texas, 166; Cravens v. Brooke, 17 Texas, 269; Jennings v. De Cordova, 20 Texas, 514; Kohlhass v. Linney, 26 Texas. 333; Mitchell v. Nix, 1 Posey's U. C., 126; Bledsoe v. Cains, 10 Texas, 456.

3. A plaintiff in this character of action is entitled to plead his claim for improvements made in good faith, and to recover their value, as well as the defendant, and as in this cause, a fortiori, a pre-empter who buys land in good faith for a home, lives upon it for thirteen years or more, putting valuable and permanent improvements on the land he thought he owned, and in every way complying with the spirit and intention of the law, which strives to protect the actual settler. Sellman v. Lee, 55 Texas, 320; Miller v. Moss, 65 Texas, 179; Mitchell v. Nix, 1 Posey's U. C., 126; Bledsoe v. Cains, 10 Texas, 455.

MARR, JUDGE, *Section A.*—The controversy in this case is about a pre-emption homestead survey of 160 acres of land situated in Jack County. The verdict and judgment were rendered in the court below in favor of the plaintiff, C. B. Sanders, and the defendant, J. D. Swetman, has appealed. His counsel have presented twenty-one assignments of error, but it will not be necessary to notice all of them. Many of them are but repetitions of the same questions.

To properly present the case and the questions involved, it will be necessary to give a summary of the evidence. The following statement, as made in the brief for the appellant, is substantially correct as far as it goes, viz.:

" On the 31st day of December, 1888, appellee Sanders instituted suit to recover of appellant Swetman 160 acres of land situated in Jack County, Texas. On the 16th day of November, 1874, Asbury Johnson had the

land sued for surveyed as a pre-emption under the Act of 1873. At the time of said survey Asbury Johnson was not living or settled upon the land, nor has he up to this day ever lived on or settled upon or improved said land.

"Sometime in the year 1875, exact date not known, Asbury Johnson made a verbal contract of sale of said land to one Cates for $50. About twelve or fifteen months after the survey of Asbury Johnson (according to the testimony of one of appellant's witnesses), Cates went into possession of the land and made some improvements. According to one of appellee's witnesses, Cates went into possession during the spring of 1875.

"In the spring of 1876 Cates sold the land to appellee Sanders by verbal sale, and he went into possession and made improvements. In 1882, Asbury Johnson, with the consent of Cates, transferred the land to appellee Sanders by deed, Cates never having received a written transfer. Neither Cates nor Sanders had the land surveyed. On the 9th of April, 1884, appellee Sanders made proof of his occupancy. He lived upon the land until 1886, and went to the Indian Nation. Before he left for the Nation, appellant Swetman, thinking the land belonged to appellee Sanders, proposed to buy it, but Sanders told him he did not intend to sell until he got a patent.

"Sanders left for the Nation, and Swetman, who was the head of a family and without a home, learned that the land was vacant public domain, and he took possession, applied for a survey, had it surveyed, the field notes returned to the General Land Office, and continued in possession, and was so in possession when this suit was instituted.

"Sanders brought an action of trespass to try title, and pleaded his title. Swetman answered by general demurrer, special exceptions, and general denial. A trial was had, and judgment rendered for appellee Sanders, that he recover the land and $60 in rent."

Plaintiff also claimed compensation for improvements in good faith, etc. Appellee's evidence went to show that he leased the land to appellant at the time of his departure for the Indian Nation, and that he intended to return and occupy the land. There is evidence, however, that he was absent about two years, and in the meantime had married. He had actually resided on the land after his purchase from Cates about twelve years, and during the greater part of that time was the head of a family, composed of his widowed mother and her minor children. No issue is raised upon this point.

The appellant "made proof of Johnson's abandonment, filed on the land, and had it surveyed, and sent the field notes to Austin." His application to pre-empt the land was made on May 10, 1888, and the survey on the 24th day of said month and year.

There was some evidence tending to show that the original claimant, Asbury Johnson, failed to occupy the land on account of his fear of hos-

tile Indians, and that when he surveyed it he intended to occupy it as the home of himself and family as soon as he could do so with safety. The question arises, however, whether he, or any one claiming under him, ever acquired any right to the land, as he had not settled upon the land at the time he caused it to be surveyed, and in fact never resided upon nor occupied the land at any time nor in any manner.

This question is sharply presented by the following assignments of error, viz.:

" 8. The court erred in refusing to give the second special charge of defendant, to-wit: 'If Asbury Johnson had the land in controversy surveyed as a pre-emptionist, and at the time of said survey had never occupied the land, the survey was unauthorized, and such survey did not sever the land from the public domain.'

" 9. The court erred in refusing to give special charge number 3, asked by defendant, to-wit: 'If the evidence satifies you that Asbury Johnson never lived upon said land in controversy, then if Cates purchased from Asbury Johnson, he took nothing by his purchase; and if Cates or said Johnson, or both of them, sold to plaintiff, plaintiff took nothing by his purchase.' Because said Johnson had no right whatever in the land, as it was public domain when Johnson sold it. A survey by one man and settlement by another many months after, will not pre-empt land, but it must be occupied by him at whose instance the survey is made."

In reply to the above proposition, the appellee submits the following counter-proposition, viz.:

" If Asbury Johnson had said land surveyed, and was the head of a family, and intended to make this the home of his family, but before he went upon the land he was compelled temporarily to leave the country, but with the intention of returning again to carry out his intention of improving and making this place the home of his family, he would have an inchoate right in the land, which would entitle him to return to the land, or to sell or transfer the same to another person, provided no abandonment was proved and the rights of no third party intervened between his departure and the sale of the land; and it would not be necessary for Johnson's assignee to have the land resurveyed, but the survey made by Johnson would enure to the assignee who purchased his inchoate right to the land."

The evidence is not very clear that Johnson "was compelled to leave the country," or that he did so "with the intention of returning again" for the purpose of "improving and making this place the home of his family," even if we may suppose that such was his original intention. This issue, however, the court below omitted to submit to the jury, except in general terms.

The court, in its charge to the jury, assumed that Johnson's claim to the land was valid and sufficient to appropriate it if he had duly caused

it to be "surveyed under and in accordance with the pre-emption laws of this State, and never abandoned the intention of moving upon and occupying the same as a homestead," whether in fact he ever occupied or actually settled upon the land or not, provided that those claiming under him subsequently did so.

Manifestly this was an erroneous view of the law, and the court also erred in refusing to allow the above special instructions, as requested by the defendant, under the facts of this case.   The survey of the land for Johnson under the Act of 1873, which regulated the acquisition of homestead donations, was unauthorized and void, as he never actually occupied, improved, nor settled upon the land, nor made any preparations to do so beyond having it surveyed.   De Montel v. Speed, 53 Texas, 339; Burleson v. Durham, 46 Texas, 152; Palmer v. Chandler, 47 Texas, 332; 65 Texas, 180.

We do not doubt that if Johnson had actually settled upon the land, but was driven off by hostile Indians, or through the fear of them, that then such enforced absence would not have amounted to an abandonment of his claim; but as he had never acquired any legal right in or to the land, there was nothing for him to abandon.   If his claim could be recognized without any actual entry or settlement upon the land, then the mere intention and survey would appropriate the land, without the application of any land certificate or warrant or other evidence of right to land, and the homestead law could have been easily perverted.

While the Act of March 13, 1875, entitled "An act supplementary to 'An act for the benefit of *actual occupants* of the public domain,' approved May 26, 1873," was not in force at the date of Johnson's survey, still he could have protected his claim to the land under its provisions by complying with the same, if he had been in fact an " actual settler," who had been " forced to abandon his land so pre-empted, by fear of hostile Indians."   The act, however, embraces only such persons as were in fact actual settlers or occupants upon the land, and required the additional proof that the occupant " returned and occupied the same as a homestead as soon as it was safe for him to do so."   Johnson's claim did not come within the provisions of this act, nor did he comply with the same, as will be seen from the testimony upon the subject.   Gen. Laws, 1875, p. 107; 3 Sayles' Early Laws, p. 325.

John Mobley testified, that he knew Asbury Johnson.   " He was my brother-in-law.   My land adjoins the land in controversy, and I lived on my place at the time the survey was made for Johnson.   He never lived on the place, and never did any work on it.   He was a married man, and never at any time had his family on the place.   At the time it was surveyed for him, he stayed at my house at night.   He lived in Parker County, Texas, at the time, and *had a homestead there*.   His family was living in

Parker County at the time, and they never moved to nor went upon the land in controversy, either before or after it was surveyed. At this time the Indians still made raids occasionally, but I still lived upon my land, and so did my neighbors,'' etc.

The testimony of David Mobley is to the same effect, and in concluding, he said, '' the Indians during this time sometimes made raids in the neighborhood, but my neighbors nor I ever abandoned our houses or left our lands.''

U. M. Johnson testified as follows: '' I lived near the place in controversy when my brother had it surveyed in 1874. At that time *he had no homestead*, and he had this place surveyed for his home, but soon after he was *inflicted* (?) with a ·bad case of sore eyes, and the Indians making raids into the county, and it being difficult for him to see, he concluded to return to Parker County until his eyes were better, and the country was more settled; but he sold the place to Geo. Cates, and never returned.''

We conclude that the plaintiff failed to establish the superior title to the land in dispute. Garrett v. Weaver, 70 Texas, 463. He can not successfully claim it in Johnson's right, because Johnson had acquired none; nor in his own right, or that of Cates, because neither of them ever had the land surveyed so as to sever it from the public domain and evidence their right thereto as required by law; and they could not·hold the land under the survey made for Johnson, because it was unauthorized and void. 3 Sayles' Early Laws, arts. 37, 74; Miller v. Moss, 65 Texas, 179.

The court erred therefore, as we said, in refusing the special instructions before noted.

The appellant also presents the following assignment, viz.:

'' The court erred in refusing to give the fourth special charge asked ·by defendant, to-wit: ' If defendant Swetman took possession of said land under a contract of lease or purchase, believing that plaintiff had a good title to the same, and defendant afterward discovered that the land was vacant, he had a right to repudiate his contract for lease or purchase without quitting possession, and the defendant, if entitled to pre-empt land, could take steps to pre-empt said land.' Because, from the law and the facts in the case, it is evident that defendant Swetman took no right to occupy said land from either Cates or Asbury Johnson by said lease, but it is shown by the evidence that while holding by lease he discovered their lack of title, and filed on the land, complying with the requirements of the statutes.''

This instruction is in substantial accord with the rule upon the subject as established by the decisions in this State, and we are therefore of the opinion that the court erred in refusing to allow it. Rodgers v. Daily, 46 Texas, ·578; Palmer v. Chandler, 47 Texas, 332; 20 Texas, 574; 17 Texas, 269.

Complaint is also made by the appellant of the action of the court in

submitting to the jury the right of the plaintiff to recover compensation for improvements in good faith. He contends that the plaintiff showed no such right as would support the claim, because the survey for Johnson was unauthorized, and did not sever the land from the public domain, etc.

We are of the opinion that the position is sound and must be sustained under the law. The land being vacant and the property of the State at the time when the improvements were made, the State could not have been required, through the instrumentality of the courts, to make compensation for such improvements in the absence of a statute authorizing such relief. The State v. Snyder, 66 Texas, 687. When, therefore, the appellant filed upon and caused the land to be surveyed for his homestead, as he was entitled to do under the laws of the State, the land itself was not charged with the claim for improvements; and if the appellant did not acquire the possession of the land as the tenant of the appellee, then no claim for compensation could be asserted against him at all for the improvements, because none could have been maintained against the State, through which he derived his right. But even if he entered upon the land under the appellee as his tenant, and made the possession thus acquired the foundation of his right to pre-empt the land, still we do not think that the claim for the improvements could be declared a charge upon the land under such circumstances, because of its homestead character, which would protect it from forced or involuntary transfer for any purpose except as authorized by the Constitution.

Whether under such circumstances the appellee would be entitled to a personal judgment against the appellant for the value of such of his improvements as the appellant has or will receive the benefits of by reason of his appropriation of the land (while a tenant of the appellee), as before explained, we need not now determine, for the reason that the appellee has not presented that issue by his pleadings, but made his claim under the statute.

We are disposed to so hold, but do not definitely settle the point.

On account of the errors which we have indicated, the judgment should be reversed and the cause remanded.

*Reversed and remanded.*

Adopted June 21, 1892.